<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BEATRICE JOHNSON<br>O/B/O JAMES JOHNSON (DEC'D)<br><br>       Plaintiff,<br><br>     v.<br><br>Carolyn W. Colvin,<br>COMMISSIONER OF SOCIAL SECURITY,<br><br>       Defendant. | Civil Action No. 12-05754<br><br><br><br>**OPINION**<br><br><br>July 16, 2013 |

**WIGENTON**, District Judge**.**

  Before this court is Plaintiff James K. Johnson's ("Plaintiff" or "Mr. Johnson") appeal of the final administrative decision of the Commissioner of Social Security ("Commissioner"), with respect to Administrative Law Judge Richard West's ("ALJ West") denial of Mr. Johnson's claim for Disability Insurance Benefits pursuant to 42 U.S.C. § 405(g). This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure 78. This court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(g). Venue is proper under 28 U.S.C. § 1391(b). For the reasons stated herein, this Court **AFFIRMS** the Commissioner's decision.

**I. FACTS AND PROCEDURAL HISTORY**

*a. Work and Medical History*

  Mr. Johnson was a 49-year old man "with a high school education and some college experience." (R. at 426.) He lived from June 6, 1961 - June 20, 2010. (*See id.* at 522.) Mr. Johnson was never married. (*See id.*)

Beginning in 1979, Mr. Johnson worked as a security guard. (*See id.* at 426.) On July 23, 2003, he was admitted to St. Mary's hospital after blacking out at his friend's house. (*See id.* at 68.) Hospital results showed that Mr. Johnson suffered from extremely high blood pressure and congestive heart failure. (*See id.*) As a result, Mr. Johnson's doctor, Joel Green ("Dr. Green") recommended to Mr. Johnson that he retire and Mr. Johnson obliged. (*See id.* at 182, 426.)

Thereafter, while still retired, Mr. Johnson worked in other capacities: as a material handler from July to November 2003 and as an overnight stock clerk from July 2004 to March 2005. (*See id.* at 426-27.) In April 2005, Mr. Johnson left retirement and recommenced working as a security guard until September 2005. (*See id.* at 427.)

In January and March 2004, Mr. Johnson was hospitalized and diagnosed with congestive heart failure, hypertension[1], angina pectoris[2] and alcoholic cardiomyopathy.[3] (*See id.* at 22, 427.) His congestive heart failure and alcoholic cardiomyopathy included 2-4+ edema[4] in both lower extremities and clubbing evident in the fingers of both upper extremities. (*See id*. at 22.) On January 8, 2004, an echocardiography "revealed severe left ventricular systolic dysfunction[5] and a left ventricular ejection fraction[6] severely reduced at 20-25%." (*Id.* at 22, 33.) "A chest x-ray obtained on the same date was consistent with cardiomegaly." (*Id.* at 22.)

---

[1] Hypertension is "a condition in which the blood pressure (BP) is higher than 140mm Hg systolic or 90 mm Hg diastolic on three separate readings recorded several weeks apart. Hypertension is one of the major risks factors for coronary artery disease, congestive heart failure, stroke, peripheral vascular disease, kidney failure, and retinopathy." TABER'S CYCLOPEDIC MEDICAL DICTIONARY 1032 (Donald Venes et al. eds., 20th ed. 2005).

[2] Angina pectoris is "[a]n oppressive pain or pressure in the chest caused by inadequate blood flow and oxygenation to heart muscle." *Id*. at 115.

[3] Alcoholic cardiomyopathy is "[h]eart muscle damage caused by years of heavy alcohol usage." *Id*. at 342.

[4] Edema is a local or generalized condition in which the body tissues contain an excessive amount of tissue fluid. *Id.* at 665.

[5] Ventricular systolic dysfunction is a condition in which the heart is unable to maintain sufficient blood flow to meet the needs of the body. *Id.* at 2135.

[6] Ejection fraction is the percentage of blood emptied from the ventricle during systole; left ventricular ejection fractions average 60% to 70% in healthy hearts but can be markedly reduced if part of the heart muscle dies or in hearts affected with cardiomyopathy or valvular heart disease. *Id.* at 671.

In August 2004, Mr. Johnson's ejection fraction rose to between 35-40%. (*See id.* at 33.) Dr. Martin Fechner ("Dr. Fechner"), a medical expert in internal medicine, opined that a 35-40% ejection rate is moderately low, but not severe. (*See id.* at 294.) The rise coincided with Mr. Johnson's cessation of alcohol consumption. (*See id.* at 207.) On March 17, 2005, Dr. Amir Choudhry ("Dr. Choudry") examined Mr. Johnson and the results indicated a pattern of improvement. (*See id.* at 370-372.) Specifically, the results showed normal skin, and normal respiratory, gastrointestinal, musculoskeletal, neurological and endocrine functioning. (*See id.*)

In August 2005, Mr. Johnson complained that he suffered from chest pains two to three times a week. (*See id.* at 428.) In September 2005, Mr. Johnson reported "that he had hypertension, that he was weak, dizzy, and experienced shortness of breath, and that he was unable to bend, walk for long periods of time, or do heavy lifting." (*Id.*)

On July 14, 2006, Dr. Ramzan Zakir ("Dr. Zakir"), a treating medical source, stated that Mr. Johnson had "good functioning capacity and was able walk over six blocks without shortness of breath or any chest pain." (*See id.* at 386.) An echocardiogram performed in August 2006 showed that Mr. Johnson had an ejection fraction of 50%. (*See id.* at 33.) This is considered normal. (*See id.* at 386.) This was Mr. Johnson's last echocardiogram. (*See id.* at 33.)

b. *Procedural History*

On March 18, 2004, Mr. Johnson filed applications for Title II Disability Insurance Benefits ("DIBs"), and Title XVI Supplemental Security Income ("SSI") benefits with the Social Security Administration ("SSA"). (*See* R. at 111, 428.) On May 13, 2004, Dr. Burton Gillette ("Dr. Gillette"), a medical consultant for a New Jersey State Agency, assessed Mr. Johnson's physical Residual Functional Capacity ("RFC")[7] on behalf of the SSA. (*See id.* at 427.) "Dr. Gillette found

---

[7] RFC designates the plaintiff's ability to work on a sustained basis despite his physical or mental limitations. The RFC determination is not a decision as to whether a plaintiff is disabled, but is used as the basis for determining the particular types of work a plaintiff may be able to perform despite his impairment(s). *Id.* at 1881.

3

that [Mr. Johnson] could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for at least two hours in an eight-hour workday, and sit for about six hours in an eight-hour workday." (*Id.* at 428.)  Dr. Gillette also "found that [Mr. Johnson] could occasionally climb ladders, ropes, and scaffolds, frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl." (*Id.*)  Additionally, Dr. Gillette found "that he had the unlimited ability to push and pull, and that he had no environmental limitations, except that he should avoid concentrated exposure to hazards such as machinery or heights." (*Id.*)  "Finally, Dr. Gillette found that Mr. Johnson did not have any manipulative, visual, or communicative limitations." (*Id.*)  As a result of Dr. Gillette's assessment, the SSA denied Mr. Johnson's applications. (*See id.* at 429.)  In response, Mr. Johnson requested the SSA to reconsider its decision. (*See id.* at 205.)

On September 21, 2005, Dr. Ellis Wilcox ("Dr. Wilcox"), an independent physician, made an evaluation on behalf of the SSA to reconsider whether Mr. Johnson's conditions entitled him to disability benefits. (*See id.* at 105.)  Dr. Wilcox concluded that Mr. Johnson's blood pressure was higher than normal, but had not damaged any vital organs. (*See id.*)  Dr. Wilcox also concluded that the medical record did not show that Mr. Johnson's condition affected his ability to engage in work requiring less physical effort than that of a security guard. (*See id.*)  As a result, the SSA determined that its denial was proper. (*See id.*)

Mr. Johnson appealed his adverse decision to the Office of Administrative Law. (*See id.* at 18.)  On December 18, 2006 and August 2, 2007, Administrative Law Judge Donna A. Krappa ("ALJ Krappa") held hearings regarding Mr. Johnson's appeal. (*See id.* at 429.) At the first hearing, Mr. Johnson testified that his chest pains persisted and that he had swollen legs. (*See id.* at 428.) However, Mr. Johnson also testified that despite his ailments, "he [could] take public transportation by himself, manage his own money, go grocery shopping, clean his home, and do his laundry." (*Id.*) "[Mr. Johnson] also testified that he [went] fishing and watche[d] football with his friends." (*Id.*)

4

In addition to testifying about his condition, Mr. Johnson testified that he had recently blacked out on a New Jersey Transit train and almost fell on the tracks. (*See id.* at 69.) Two days after this incident, Mr. Johnson went to the hospital to get evaluated. (*See id.*) After the visit, Mr. Johnson was told by Dr. Anis Aziz ("Dr. Aziz"), a cardiologist at the University Hospital, in Newark, New Jersey that he suffered from extremely high blood pressure. (*See id.* at 69, 88.) Dr. Aziz prescribed Veratec for Mr. Johnson's high blood pressure. (*See id.* at 70.) In addition to Dr. Aziz's assessment, both Dr. Aziz and Dr. Thomas,[8] whom Mr. Johnson visited twice a month, stated that his heart was operating at 50% capacity. (*See* R. 73.)

On August 27, 2007, ALJ Krappa held a supplemental hearing, where Dr. Fechner testified regarding Mr. Johnson's RFC. (*See id.* at 22.) After reviewing all the available evidence, including Mr. Johnson's December 18, 2006 hearing testimony, Dr. Fechner testified that Mr. Johnson's heart problems could have been caused or exacerbated by his excessive drinking during the time of his low left ventricular ejection fraction readings. (*See id.* at 22, 23.) "Dr. Fechner [also] testified that [Mr. Johnson's] drinking could aggravate his heart problems."[9] (*Id.* at 23.)

On December 20, 2007, ALJ Krappa denied Mr. Johnson's appeal on the grounds that his RFC was compatible with his past work as a security guard. (*See id.* at 430.) On February 21, 2008, Mr. Johnson requested that the Social Security Appeals Council ("Appeals Council") review ALJ Krappa's decision. (*See id.*) On February 6, 2009, the Appeals Council concluded that there were no grounds for review and denied the request. (*See id.*) The denial made ALJ Krappa's decision final. (*See id.*) On April 2009, before the Honorable Faith S. Hochberg ("Judge Hochberg"), Mr. Johnson sought a reversal of ALJ Krappa's decision or a remand to the Commissioner for reconsideration. (*See id.*) In appealing ALJ Krappa's decision, Mr. Johnson challenged ALJ

---

[8] The Administrative Record does not reveal Dr. Thomas's first name. It does, however, reveal that she is a general practitioner. She worked at the Center for Family Health in Hoboken, New Jersey.

[9] At the hearing, Mr. Johnson testified, "that he was drinking about once a week and that he would drink "a 12 ounce can of beer and a shot of liquor." (Id.)

5

Krappa's finding that his RFC was compatible with his past work. (*See id.* at 434.) On December 1, 2009, Judge Hochberg issued an opinion and order remanding Mr. Johnson's case to reconsider whether Mr. Johnson's RFC was compatible with his past work as a security guard. (*See id.* at 426-435.) Specifically, Judge Hochberg wanted ALJ Krappa to determine whether Mr. Johnson's past relevant work potentially required him to take physical action like chasing or apprehending a suspect. (*See id.*)

On June 20, 2010, Mr. Johnson passed away. (*See* R. at 522.) The Commissioner accepted Mr. Johnson's mother, Beatrice Johnson as a substitute party. (*See id.*) She was eligible to receive her son's Title II disability insurance benefits for the period spanning from July 23, 2003, the date Mr. Johnson allegedly became disabled, to the date of his death. (*See id.*)

On September 13, 2010, ALJ Krappa held the supplemental hearing ordered by Judge Hochberg. (*See id.* at 430, 440.) Mrs. Johnson and Mr. Johnson's sister, Carol Johnson were present. (*See id.* at 440.) Vocational expert, Rocco J. Meola ("Mr. Meola") testified at ALJ Krappa's request. (*See id.*) "Mr. Meola stated that based upon the record and the minimum rate at which [Mr. Johnson] was paid, he was a general security guard and was not licensed to carry a gun," and therefore would not have been required to intervene in a dangerous situation. (*Id.* at 446.) Furthermore, Mr. Meola testified that Mr. Johnson's work entailed simple observation and reporting, along the lines of requiring him to follow suspects to their car in order to "retrieve a license plate number." (*See id.*) Mr. Meola's testimony led ALJ Krappa to conclude that Mr. Johnson's "prior relevant work did not require him to 'jump into action to apprehend suspects' or otherwise place himself in danger." (*See id.*) On September 23, 2010, ALJ Krappa upheld her prior decision issuing a second unfavorable decision for Mr. Johnson. (*See id.* at 447.)

On October 26, 2010, in light of ALJ Krappa's second unfavorable decision, Mrs. Johnson sought review from the Appeals Council. (*See id.* at 482-84.) On February 23, 2011, the Appeals

6

Council issued two orders. One order dismissed the SSI portion of Mr. Johnson's claim because he had no surviving spouse eligible to collect past SSI benefits. (*See id.* at 485-93.) The other order remanded the Title II portion of this claim. (*See id.*) Further, the Appeals Council assigned Mr. Johnson's claim to a different ALJ, the Honorable Richard West ("ALJ West"), who was ordered to hold a hearing to: (1) reconsider Mr. Johnson's maximum RFC and provide appropriate rational with specific references to evidence in the record, (2) reevaluate his subjective complaints, (3) "ensure that all evidence is entered into the record[,]"[10] (4) "further evaluate subjective complaints and provide rationale in accordance with the disability regulations pertaining to evaluation of symptoms[,]" and (5) attempt to ascertain the nature of the work activity suggested by Mr. Johnson's employment from 2006-2008. (*See id.* at 492.) Due to a dearth of medical evidence for the period from August 2006-June 20, 2010, the Appeals Council also ordered ALJ West to permit Mrs. Johnson and Carol Johnson to testify at the hearing. (*See id.*) Their testimony would permit ALJ West to: (1) determine if Mr. Johnson received medical treatment prior to his hospital admission in June 2010, (2) obtain any corresponding records, and (3) evaluate Mrs. Johnson and Carol Johnson's credibility. (*See id.*)

On July 19, 2011, ALJ West conducted the mandated hearing; however, Mrs. Johnson and Carol Johnson failed to appear. (*See id.* at 379-390.) On December 1, 2011, ALJ West issued an unfavorable decision for Mrs. Johnson. (*See id.* at 379.) The decision reversed ALJ Krappa's prior finding that Mr. Johnson could perform a full range of light work that included his past work as a security guard. (*See id.* at 389.) Instead, ALJ West found Mr. Johnson capable of the full range of sedentary work. (*See id.*) ALJ West's finding precluded Mr. Johnson from working as a security guard; however, it did not equate to a finding that Mr. Johnson was disabled. (*See id.*) After ALJ

---

[10] The Appeals Council noted that medical evidence was not entered into the record. The evidence consisted of a March 2, 2005 EKG tracing and laboratory results, an examination report by Dr. Faltas[10] dated March 4, 2005, and a March 18, 2005 report from Harbor Medical Imaging. (*See id.* at 492.)

West's decision, on December 29, 2011, Mrs. Johnson requested the Appeals Council to review the decision. (*See id.* at 377-378.)  On July 12, 2012, the Appeals Council declined review. (*See id.* at 373-376.)  Mrs. Johnson now seeks relief from this Court.

## II.    LEGAL STANDARD

In social security appeals, this Court has plenary review of the legal issues decided by the Commissioner. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  However, this Court's review of the ALJ's factual findings is limited to determining whether there is substantial evidence to support those conclusions. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938)).

Substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'" *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x. 613, 616 (3d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Importantly, "[t]his standard is not met if the Commissioner 'ignores, or fails to resolve, a conflict created by countervailing evidence.'" *Bailey*, 354 F. App'x. at 616 (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).  However, if the factual record is adequately developed, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)).  "The ALJ's decision may not be set aside merely because [a reviewing court] would have reached a different decision." *Cruz v. Comm'r of Soc. Sec.*, 244 F. App'x. 475, 479 (3d Cir. 2007) (citing *Hartranft*, 181 F.3d at 360).  The court is required to give substantial weight and deference to the ALJ's findings. *See Scott v. Astrue*, 297 F. App'x. 126, 128 (3d Cir. 2008).  Nonetheless, "where there is conflicting evidence, the ALJ must explain which evidence he accepts and which he rejects, and the

8

reasons for that determination." *Cruz*, 244 F. App'x. at 479 (citing *Hargenrader v. Califano*, 575 F.2d 434, 437 (3d Cir. 1978)).

In considering an appeal from a denial of benefits, remand is appropriate "where relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits." *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) (quoting *Saldana v. Weinberger*, 421 F. Supp. 1127, 1131 (E.D.Pa. 1976)).  Indeed, a decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984).

**III. DISCUSSION**

  *a. SSDI Test*

An individual will be considered disabled under the Social Security Act (the "Act") if he or she is unable to "engage in any substantial gainful activity [("SGA")] by reason of any medically determinable physical or mental impairment" lasting continuously for at least twelve months. 42 U.S.C. § 423(d)(1)(A).  The physical or mental impairment must be severe enough to render the individual "not only unable to do his previous work but [unable], considering his age, education, and work experience, [to] engage in any kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).  A claimant must show that the "medical signs and findings" related to her ailment have been "established by medically accepted clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged . . . ." *Id*.

In order to establish a prima facie case of disability under the Act, a plaintiff bears the burden of demonstrating: (1) that she was unable to engage in SGA by reason of physical or mental

impairment that could have been expected to last for a continuous period of at least twelve months, and (2) that the existence of such impairment was demonstrated by evidence supported by medically acceptable clinical and laboratory techniques. *See* 42 U.S.C. § 1382c (a)(3).

In determining disability, the SSA utilizes a five-step sequential analysis. *See* 20 C.F.R. § 416.920; *see also Cruz*, 244 F. App'x. at 479. A determination of non-disability at steps one, two, four, or five in the five-step analysis ends the inquiry. *See* 20 C.F.R. § 416.920. A determination of disability at steps three and five results in a finding of disability. *See id.* If an affirmative answer is determined at steps one, two, or four, the SSA proceeds to the next step in the analysis. *See id.*

At step one, the Commissioner must determine whether the claimant is engaging in SGA. *See* 20 C.F.R. 416.920(b). SGA is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities. *See* 20 C.F.R. 416.972(a). "Gainful work activity" is work that is usually done for profit, whether or not profit is realized. *See* 20 C.F.R. 416. 72(b). If an individual engages in SGA, he is not disabled regardless of the severity of his physical or mental impairments. *See id.* If the individual is not engaging in SGA, the Commissioner proceeds to the next step. *See id*.

At step two, the Commissioner must determine whether the claimant has a medically determinable severe impairment or a severe combination of impairments. *See* 20 C.F.R. 416.920(c). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. *See* 20 C.F.R. 416.921. An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or combination of abnormalities that would have a minimal effect on an individual's ability to work. *See id*. If the claimant does not have a severe impairment or severe combination of impairments, he is not disabled. *See* 20 C.F.R. 416. 972(c). If the claimant

does have a severe impairment or severe combination of impairments, the analysis proceeds to the third step. *See id.*

At step three, the Commissioner must determine whether the claimant's impairment or combination of impairments meets the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P Appendix 1. *See* 20 C.F.R. 416.920(d), 416.925, 416.926. If the claimant's impairment or combination of impairments meets the criteria of a listing and the duration requirement, the claimant is disabled. *See* 20 C.F.R. 416.920(d). If the claimant does not, the analysis proceeds to the next step. *See id.*

After step three, but before considering step four, the Commissioner must determine the claimant's RFC. *See* 20 C.F.R. § 416.920(e); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987). In making this determination, the Commissioner must consider all of the claimant's impairments, including impairments that are not severe. *See* 20 C.F.R. § 416.920(e), 416.945.

At step four, the Commissioner must determine whether the claimant has the RFC to perform the requirements of his past relevant work. *See* 20 C.F.R. 416.920(f). "Past relevant work" means work performed within the fifteen years prior to the date that the disability must be established. *See id.* If the claimant has the RFC to perform his past relevant work, the claimant is not disabled. *See id.* If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth step. *See id.*

At step five, the Commissioner must determine whether the claimant is able to do any other work considering his RFC, age, education, and work experience. *See* 20 C.F.R. § 416.920(g).

The claimant bears the burden of persuasion in the first four steps. *See Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x. 761, 763 (3d Cir. 2009). If the claimant establishes that his impairment prevents him from performing any of his past work, the burden shifts to the Commissioner at step five to determine whether the claimant is capable of performing alternative, substantial, gainful,

activity present in the national economy. *See* 20 C.F.R. § 416.920(g); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987).

  b. *Analysis*

Here, ALJ West addressed each step of the sequential analysis. At step one, ALJ West found that Mr. Johnson did not engage in SGA from July 23, 2003 through June 20, 2010. (*See* R. at 385.) ALJ West found that Mr. Johnson was employed in the 2004 and 2005 calendar year; however, his work activity did not amount to SGA. (*See id.*) Further, ALJ West found that Mr. Johnson was employed with different security companies from 2006 to 2008. ALJ West declined to make a step one finding because Mr. Johnson was unavailable to testify regarding his work history. At step two, ALJ West found that Mr. Johnson had the following severe impairments: alcoholic cardiomyopathy, congestive heart failure, hypertension, and angina pectoris. (*See id.*) At step three, ALJ West found that Mr. Johnson's impairments did not meet the listings. (*See id.*) At step four, ALJ West found that Mr. Johnson had the RFC to perform the full range of sedentary work. (*See id.* at 386.) At step five, ALJ West found that there were jobs that existed in significant numbers in the national economy that Mr. Johnson could have performed from July 23, 2003 to June 20, 2010.[11] (*See id.* at 389.)

  i. <u>Step One</u>

SGA is work that involves significant physical or mental activities and that is done for pay or profit. *See* 20 C.F.R. § 416.972(a)-(b). If a claimant is found to be engaged in SGA, the disability claim will be denied. *See Bowen*, 482 U.S. at 140. Here, ALJ West decided to skip step one given the factual issues that could not be resolved due to Mr. Johnson's unavailability.

Mrs. Johnson's argument regarding ALJ West's step one finding has two components. (*See* Pl.'s Br. 11.) First, Mrs. Johnson argues that ALJ West's conclusion that Mr. Johnson did not

---

[11] At steps one and three, ALJ West adopted ALJ Krappa's findings from her September 23, 2010 hearing.

engage in SGA is based on conflicting findings since ALJ West found that Mr. Johnson did not perform SGA from 2003-2010 yet found that Mr. Johnson worked from 2006- 2008. (*See id.*) Second, Mrs. Johnson alleges that there were omissions in the mandated protocol for considering subjective complaints. (*See id.*) Specifically, Mrs. Johnson argues that: (1) Mr. Johnson's testimony was not recorded; (2) his credibility was not assessed; (3) the step one finding was predicated on conflicting findings; and (4) the details of the mandated protocol were neither recited nor followed.[12] (*See id.*)

Mrs. Johnson's first argument is misplaced. ALJ West did not make a finding at step one, but instead skipped step one and continued to step two. (*See* R. at 385.) ALJ West skipped step one due to Mr. Johnson's unavailability to reconcile conflicting facts regarding his work history. Therefore, ALJ West was correct in not making a finding in step one and moving on to step two of the evaluation process.

    ii.  Step Two

In executing step two, an ALJ must consider all symptoms and the extent to which they can reasonably be accepted with objective medical evidence and other evidence. *See* 20 C.F.R. 416.929. Under the applicable regulations, an impairment is severe only if it significantly limits the claimant's physical or mental ability to do "basic work activities."[13] 20 C.F.R. § 404.1521(b). A "severe" impairment is distinguishable from "a slight abnormality," which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of age, education, or work experience. *See Bowen*, 482 U.S. at 149-51.

---

[12] Mrs. Johnson's second argument is discussed in section iv.

[13] Basic work activities include:
> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling, or mental activities such as understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b).

Here, ALJ West found that Mr. Johnson had the following severe impairments: alcoholic cardiomyopathy, congestive heart failure, hypertension, and angina pectoris. (*See* R. at 385.)

Mrs. Johnson alleges that ALJ West's step two finding was flawed because ALJ West did not find that Mr. Johnson suffered from ischemic heart disease. (*See* Pl.'s Br. 12, 13.) Mrs. Johnson argues that ALJ West's finding, which was based on Dr. Fechner's testimony, was based on incomplete evidence because ALJ West failed to consider an EKG from March 2005. (*See id.*) Mrs. Johnson argues that the Appeals Council ordered the March 2005 EKG, which allegedly showed that Mr. Johnson suffered from ischemic heart disease, to be included in the record upon remand. (*See id.* at 12.) Mrs. Johnson argues that due to the absence of the March 2005 EKG from the record, Dr. Fechner never evaluated the medical records concerning Mr. Johnson's heart condition before rendering his opinion on December 18, 2006. (*See id.*)

The Commissioner contends that Mrs. Johnson's argument is baseless for two reasons. (*See* Def.'s Br. 6.) First, the Commissioner asserts that the burden of proof is on Mrs. Johnson to show that an impairment is severe and she fails to satisfy this burden. (*See id.*) Second, the Commissioner argues that Mr. Johnson did not allege ischemic heart disease when asked to list his impairments and also failed to mention ischemic heart disease at the July 19, 2011 hearing. (*See id.* at 6-7.) The Commissioner notes that contrary to Mrs. Johnson's argument, there is an August 10, 2004 stress test where cardiologist Dr. Robert Costomiris concluded the test revealed a negative stress myocardial perfusion imaging scan for ischemia. (*See id.* at 6.)

Mrs. Johnson's contention that evidence in the record is incomplete is also a misplaced argument. The Appeals Council noted in its February 23, 2011 order that there was medical evidence, which included the March 2005 EKG that was not entered into the record. (*See* R. at 492.) The Appeals Council, however, did not specifically order that this medical evidence be placed in the record on remand. (*See id.*) Mrs. Johnson's argument concerning the March 2005 EKG

14

seems to mischaracterize the Appeals Council's order. ALJ West noted in his opinion that at the supplemental hearing, Mrs. Johnson's representative indicated that, "to his knowledge, all available medical evidence was in the record." (R. at 387.) Also, the transcript of ALJ West's supplemental hearing shows that Mrs. Johnson's representative did not bring up the issue of ischemic heart disease or missing medical evidence. (*See* R. at 565-77.) Therefore, Mrs. Johnson's argument is untimely since she asserts it now for the first time. Given the evidence in the record regarding Mr. Johnson's impairments, ALJ West's step two finding was supported by substantial evidence.

          iii.   Step Three

At step three, the ALJ must "compare the claimant's medical evidence to a list of impairments presumed severe enough to negate any gainful work." *Caruso v. Comm'r of Soc. Sec.*, 99 F. App'x. 376, 379 (3d Cir. 2004). This is an "argument which is entirely dependent upon the merits of [Plaintiff's] argument that the ALJ erred at [s]tep [t]wo." *Salles v. Comm'r of Soc. Sec.*, 229 Fed. App'x. 140, 145 (3d Cir. 2007). When a claimant's impairments meet or equal a listing, "disability is conclusively established and the claimant is awarded benefits." *Knepp*, 204 F.3d at 85. The Third Circuit requires the ALJ to "fully develop the record and explain his findings at step three." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000). The ALJ is required to issue more than just a conclusory statement that a claimant does not meet the listings. *See Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001) (*citing Burnett*, 220 F.3d at 119-20). *Burnett* "does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." *Padilla v. Comm'r of Soc. Sec.*, No. 09-2897, 2010 WL 2346650 at *5 (D.N.J. June 9, 2010) (citing *Jones v. Barnhart*, 364 F.3d 502, 505 (3d Cir. 2004)).

ALJ West found that Mr. Johnson's impairments did not meet the listings "since his [impairments] [were] not accompanied by clinical evidence of ischemic heart disease with chest

15

discomfort associated with myocardial ischemia, a sign or symptom limited exercise stress test, impaired myocardial function, coronary artery disease or recurrent arrhythmias resulting in the inability to carry on any physical activity[.]" (R. at 385.)  ALJ West based his finding on Dr. Fechner's testimony in the hearing before ALJ Krappa.  (*See id.*)

Similar to her argument regarding step two, Mrs. Johnson argues that ALJ West's step three finding was improper because it relied solely on Dr. Fechner's testimony.

Given this Court's conclusion regarding ALJ West's step two finding, this Court concludes that impairments considered by ALJ West were correct.  First, ALJ West made it a point to provide more than a conclusory explanation of Mr. Johnson's failure to meet the listings.  Moreover, ALJ West properly found that Mr. Johnson's impairments did not meet the listings as Mr. Johnson's ailments were not accompanied by clinical evidence that demonstrate impairments corresponding to those in the listings.

          iv.   <u>Steps Four</u>

At step four, the Commissioner must determine whether the claimant has the RFC to perform the requirements of past relevant work. *See* 20 C.F.R. 416.920(f).  Here, ALJ West found that Mr. Johnson had the RFC to perform the full range of sedentary work.  (*See* R. at 386.)

Mrs. Johnson alleges that ALJ West's step four analysis failed to explain how the medical evidence yields an RFC for "the full range of sedentary work." (*See* Pl.'s Br. 15.)  Mrs. Johnson states that the only explanation offered is Dr. Zakir's statement that Mr. Johnson had "good functional capacity" and that he could walk more than six blocks "without shortness of breath or chest pain." (*Id.*)  Mrs. Johnson argues that Dr. Zakir's statement does not support ALJ West's finding because the statement is not a medical assessment, but rather, only based on Mr. Johnson's remarks to Dr. Zakir. (*See id.*)

Mrs. Johnson mischaracterizes ALJ West's opinion. ALJ West relied on Dr. Zakir's statements in addition to other evidence such as Mr. Johnson's previous testimony, Mr. Johnson's ailments, and Mr. Meola's testimony. Mr. Meola's testimony demonstrated that Mr. Johnson's past relevant work required a light level of physical exertion in which, given his ailments, he would not be able to engage.

ALJ West also gave further consideration to Mr. Johnson's subjective complaints, which Mr. Johnson expressed during his testimony at the December 18, 2006 hearing. (*See* R. at 387.) ALJ West found that Mr. Johnson's testimony was "consistent with a residual functional capacity of at least sedentary work activity." (*See id.*)[14] ALJ West also noted that given Mr. Johnson's employment during 2006 and 2008, "any contention that he was unable to work at least sedentary level of physical exertion" was not credible. (*Id.*) Lastly, ALJ West stated that Mr. Johnson's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not credible to the extent they are inconsistent with [his RFC]." (*Id.*)

    v. <u>Steps Five</u>

At step five, the Commissioner must determine whether the claimant is able to do any other work considering his RFC, age, education, and work experience. *See* 20 C.F.R. § 416.920(g). Here, ALJ West found that there are jobs that existed in significant numbers in the national economy that Mr. Johnson could have performed from July 23, 2003 to June 20, 2010.

Mrs. Johnson contends that ALJ West's finding at step five was improper because ALJ West did not use a vocational expert. (*See* Pl.'s Br. 18.) This Court disagrees.

As is evident from the administrative record, Dr. Gillette found that Mr. Johnson's impairments posed no manipulative limitations and made no reference to limitations regarding foot

---

[14] At the December 18, 2006 hearing Mr. Johnson testified that despite his ailments "he [could] take public transportation by himself, manage his own money, go grocery shopping, clean his home, and do his laundry." (R. at 428.) He also testified that he went fishing. (*See id.*)

17

controls. (*See id.*)  Dr. Gillette also found no edema during his multiple appointments with Mr. Johnson. (*See id.*)  Accordingly, ALJ West's decision not to use a vocational expert was supported by substantial evidence since there is no evidence showing that Mr. Johnson's impairments caused nonexertional limitations.

**IV.     CONCLUSION**

For the foregoing reasons, the Court holds that substantial evidence supports ALJ West's decision.  Accordingly, this Court **AFFIRMS** the judgment of ALJ West.

s/Susan D. Wigenton, U.S.D.J.

Orig:   Clerk
Cc:     Parties